## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

AVID SPORTSWEAR, LLC
f/k/a NT Partners, LLC

      Plaintiff,

vs.                                                         Case No.:

GMPC LLC,

      Defendant.

---

## COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff AVID Sportswear, LLC ("AVID") by and through counsel, states and alleges as follows:

### INTRODUCTION

1.      AVID is a family-owned business that has designed and sold sporting apparel and accessories continuously since 2010. AVID offers outdoor sportsmen and women a line of clothing and accessories under a premium sporting lifestyle brand that supports and celebrates their outdoor pursuits, whether on the water or in the field. AVID focuses on design, style, quality, and performance to deliver superior and distinctive products to its customers in the United States and around the globe.

2.     Since 2019, AVID entrusted Defendant GMPC, LLC, a California private label apparel production and distribution management company, to license AVID's trademarks, and help manufacture and grow AVID's burgeoning business by supporting AVID's manufacturing, sales, and distribution functions.

3.     But after GMPC materially breached the parties' contracts multiple times in four years, it became apparent AVID could no longer trust GMPC to support AVID's business. Accordingly, AVID terminated the contracts in September 2022 after GMPC refused to manufacture AVID's Spring/Summer 2023 product lines.

4.     But even after AVID terminated the contracts with GMPC, GMPC continued to interfere with AVID's business by slow-walking or altogether refusing to transition critical business assets and operations back to AVID. And GMPC undermined AVID's business and brand during GMPC's limited post-termination sell-through period by misusing AVID's intellectual property, maintaining AVID domain names in GMPC's name, and marketing and advertising AVID products to retailers at a deep discount and with uncommon extended payment terms to AVID's existing customers.

5.     This lawsuit seeks to remedy the damage GMPC's unlawful actions have caused and is still causing AVID, make AVID's owners whole, and enjoin GMPC's continuing infringement of AVID's intellectual property.

## PARTIES

6.      Plaintiff AVID Sportwear, LLC, formerly known as NT Partners, LLC, is a Florida limited liability company. AVID is a Florida-based, family-owned sporting lifestyle brand. AVID designs, manufactures, and sells top-of-the-line performance sports apparel and accessories for sportsmen and women across the world. AVID is a small and growing business whose husband and wife ownership team, Tim and Nicole Johnson, live in and are citizens of Tampa, Florida. AVID's principal place of business is in Florida.

7.      Defendant GMPC, LLC is a Delaware limited liability company based in Los Angeles, California. GMPC holds itself out as a "streamlined product creation solution" and "private label company . . . dedicated to providing concept through delivery service."[1] GMPC markets itself as a "turn-key solution" for companies interested in "entrust[ing] [GMPC] . . .so that they can focus on their core business." *Id.*

8.      GMPC solicits, conducts, and maintains substantial business in Florida, including with several Florida-based companies like Walt Disney World, Margaritaville, SeaWorld, and Universal Studios.[2] The contracts between the parties herein also required GMPC to perform actions in this state which they failed to perform.

---

[1] *See* GMPC, *Our Story*, available at https://www.gmpc.com/our-story/.
[2] *See* GMPC, *Industries: Resort*, available at https://gmpc.com/industries/resort/.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper under 28 U.S.C. § 1332. Defendant GMPC is a Delaware-incorporated limited liability company with a principal place of business in Los Angeles, California. None of GMPC's members are citizens of Florida. Plaintiff AVID is a Florida-incorporated limited liability company with a principal place of business in Tampa, Florida. All of AVID's members are citizens of Florida. The amount in controversy exceeds $75,000.

10.     Jurisdiction is also proper under 28 U.S.C. § 1331. Plaintiff AVID is bringing claims against Defendant GMPC arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

11.     Jurisdiction is proper, too, under 28 U.S.C. § 1367. This Court can exercise supplemental jurisdiction over the remaining Florida state causes of action because this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1332 and the state claims are so related to the claims over which the court has original jurisdiction that they form part of the same case or controversy.

12.     Venue is proper under 28 U.S.C. § 1391(b)(1) because AVID and its members reside in this judicial district and under 28 U.S.C. § 1391(b)(2) because substantial part of the events or omissions giving rise to AVID's claims occurred in this district. Venue is also proper in this judicial district because the Parties' contracts lie venue in federal court in Tampa, Florida.

13.     All conditions precedent to the filing of this action have occurred or have been waived by the parties.

## FACTUAL BACKGROUND

**A. AVID's founders build the family-owned brand from the ground up.**

14.     AVID is the brainchild of Tim and Nicole Johnson, the husband-and-wife team that started the company in 2009. As passionate outdoors sports afficionados with busy family and professional lives, the Johnsons wanted to build an apparel brand that reflected their diverse lives and interests, and that would appeal to like-minded consumers who sought premium gear at a reasonable price.

15.     Out of that desire came AVID, a sporting lifestyle company dedicated to designing and producing high-end sportswear celebrating and serving outdoorsmen and women around the world. AVID started by serving Florida's passionate sportfishing community. AVID's trademark and logo highlight AVID's sportfishing origins:



**AVID Mark and AVID Hook Logo**

16.     The Johnsons initially built and ran AVID—initially known as NT Partners, LLC (*i.e.*, Nicole and Tim Partners)—out of their then-Palm Beach Gardens home. AVID started small, with a 1,000 sq ft retail store carrying like-minded brands and a few AVID-branded products. In its first year, AVID generated just shy of $100,000 in sales. With AVID's own branded products

quickly becoming the top selling brand in the retail shop, Tim and Nicole shifted focus, shutting down the retail store and focusing on building AVID's brand.

17.    AVID has provided its apparel and accessories under the mark "AVID" ("AVID Mark") and the AVID hook logo ("Hook Logo") continuously in commerce since at least as early as 2010, and AVID continues to market and sell such products under the AVID Mark and Hook Logo.

18.    Over time, and after pouring nearly a decade's worth of blood, sweat, and tears into the brand, AVID's popularity exploded in 2016, 2017, and 2018. During that period, AVID's sales and brand recognition skyrocketed, pushing AVID's in-demand sportswear (hats, t-shirts, performance button downs, and more) into stores across the country—and around the world.

 

**Example AVID Products**

19.    After consistent—and significant—year-over-year growth, AVID brought on a seasoned sales team to help expand distribution and build brand awareness. The Johnsons saw their investment quickly rewarded, with AVID's

6

sales reaching almost into seven figures by 2016. AVID maintained its strong sales growth with sales skyrocketing past the seven-figure mark in 2017 and 2018 with hundreds of independent and regional retailers selling AVID products. Additionally, in 2018 AVID secured purchase orders from two large, national retailers, Dicks Sporting Goods and Hibbett Sporting Goods, for the 2019 season, all before GMPC entered the picture.

20.     Although still very much a small, family-owned business, the AVID brand is now marketed, and its products distributed and recognized, worldwide. And while AVID stays true to its sportfishing roots, AVID now more broadly serves the market for premium outdoor lifestyle apparel and accessories, including, by way of example, a variety of clothing items and headwear for men, women, and youth, including performance and standard hoodies; shirts and jackets; t-shirts; hats, caps, visors and beanies; and accessories such as sun masks, drinkware, and decals.

21.     Today, AVID products are found in shops in over two-dozen states and as far away as the Middle East, the Bahamas, and Mexico. Customers can buy AVID products online through AVID's e-commerce site at www.avidgear.com, at locally owned shops, and through retailers including Dick's Sporting Goods, Hibbett Sporting Goods, Divers Direct, and Ron Jon Surf Shop.

22.     The AVID Mark and Hook Logo are inherently distinctive as applied to apparel and accessories.

23.     As a result of use in commerce of the AVID Mark and Hook Logo by AVID for well over a decade, and the quality of the products sold thereunder, such marks have come to be known among the relevant public as an indicator of products originating with, sponsored by, or otherwise associated with AVID, exclusively.  AVID enjoys substantial goodwill in the AVID Mark and Hook Logo.

24.     AVID took steps to protect its extremely valuable AVID Mark and Hook Logo. AVID owns U.S. Registration No. 5,211,530 for the Hook Logo for "clothing and headgear, namely t-shirts, shirts, polos, shorts, bathing trunks, swimsuits, jackets, hoodies, hats, visors, and skull caps." Registration No. 5,211,530 issued on the Principal Register in the U.S. Patent and Trademark Office ("USPTO") on May 30, 2017, and is valid, subsisting and incontestable. *See* Exhibit A.

25.     AVID also owns U.S. Registration No. 5,712,585 for the AVID Mark in stylized form for "clothing and headwear, namely, t-shirts, polo shirts, long sleeve shirts, sun and heat protective shirts, hats, visors, shorts, jackets, and hoodies". Registration No. 5,712,585 issued on the Principal Register in the USPTO on April 2, 2019, and is valid and subsisting. *See* Exhibit B.

**B. AVID works with GMPC to license AVID's trademarks and maximize growth.**

26.     As AVID's popularity soared, the Johnsons decided to seek outside support to scale product production and expand AVID's market exposure.

27.    The Johnsons were contacted by Steve Wegner, a GMPC principal, after Wegner learned about AVID while visiting his son at college. GMPC and Wegner (and Wegner's partners at GMPC, including Flash Mandel and Gary Mandel) pitched GMPC's "turnkey" brand management, manufacturing, and sales experience to the Johnsons, explaining that GMPC regularly worked with companies in AVID's market segment, including many in Florida.

28.    During these preliminary discussions, the Johnsons explained that while they were open to help *growing* and *building* AVID, because they had invested significant time and treasure into the brand, already reached a high-level of brand success and profitability, and already enjoyed well-established relationships with manufacturers, retailers, and other business partners, that they didn't intend to turn AVID over, wholesale, to a merchandising partner.

29.    Instead, the Johnsons were looking to enter a relationship that facilitated AVID's growth while preserving its baseline customer and business partner goodwill and maintaining the Johnsons' ultimate control over AVID's trademarks, designs, and business model. For instance, even before partnering with GMPC, AVID had built a long-standing relationship with hundreds of local and national retailers, including Dick's, Hibbett, Ron Jon, Lids, and Diver's Direct.

30.    With those goals in mind, and after significant negotiation, AVID and GMPC entered into a Merchandising License Agreement (the "Licensing Agreement") on January 1, 2019. *See* Exhibit C, Licensing Agreement.

31.     Under the Licensing Agreement, AVID (as owner and licensor of the AVID Mark, Hook Logo and other proprietary designs and materials) granted GMPC (the licensee), a defined, time-limited, and exclusive license to "use, manufacture, market, and distribute" AVID's branded products, while preserving AVID's status as "sole and exclusive owner of the trade styles, trademarks, logos, designs, and other proprietary materials" associated with AVID. AVID maintained primary control over its marketing, product approval and creative design efforts as well as its general business direction. However, because the license granted to GMPC was exclusive, even as to AVID, it was critical that GMPC fulfill its manufacturing and distribution obligations throughout the entire term of the license and to transition the business back to AVID upon termination in a prompt and orderly fashion.

32.     In exchange for that exclusive license, GMPC had the right, under sections 3.1 and 3.2 of the Licensing Agreement, to approximately eighty percent of proceeds from GMPC's sales of AVID-branded products within designated Distribution Channels—a set of approved accounts.

33.     GMPC had no right to market or distribute AVID's products to unapproved accounts outside the designated Distribution Channels. *Id.* § 1.5. If GMPC wanted to market and sell AVID products in other distribution channels or to other accounts, it needed AVID's prior written consent. *Id.*

34.     Per the same sections of the Licensing Agreement, GMPC agreed to pay quarterly royalties ("payable no later than the last day of the month following

the end of the preceding calendar quarter") equal to twenty percent of GMPC's sales of AVID goods (five percent of which were "marketing royalties" which, in keeping with the spirit of the agreement that AVID retained brand control, AVID would use on marketing and public relations expenses).

35.    The Licensing Agreement also contains a series of guardrails designed to protect AVID's control over its brand, trademarks, and preexisting goodwill and business relationships. In relevant part, and among other things, the Licensing Agreement requires that:

- GMPC obtain AVID's written preapproval to selling to new accounts. *Id.* § 1.5.5.

- GMPC meet certain annual sales thresholds. *Id.* § 2.3.

- GMPC provide sufficient supplemental in-season inventory of not less than 25 percent of the season's pre-bookings. *Id.* § 5.2.6.

- GMPC retain employees or independent contractors qualified and "in such numbers" as necessary to discharge its duties under the Licensing Agreement. *Id.* § 5.2.7.

- GMPC create and provide AVID "detailed business plans" before the start of each spring and fall season. *Id.* § 5.2.8.

- GMPC solicit and incorporate "the formal input and direction provided by" AVID for all product and graphic designs. *Id.* § 6.2.

- GMPC produce AVID products at "a quality consistent with or greater than prior [products] produced by" AVID. *Id.* § 6.5.

- GMPC create and provide AVID comprehensive pre-season packages of calendars, designs, dates, deadlines, and product samples. *Id.* § 6.6.

- GMPC provide advertising and sales materials to AVID before each season for AVID's preapproval. *Id.* § 7.5.

36. GMPC also agreed to "use its best efforts to promote, sell, and distribute" AVID's products. *Id.* § 5.2.1.

37. The Licensing Agreement further requires GMPC to pay AVID's "reasonable attorneys' fees, witnesses' fees, investigation fees, court reporters' fees and other out-of-pocket expenses incurred by . . . [AVID] based upon, relating to, arising out of, or otherwise in respect of (i) the breach of th[e] [Licensing] Agreement; or (ii) the services of [GMPC] contemplated by" the Licensing Agreement. *Id.* § 14.2.

38. With the Licensing Agreement, AVID and GMPC entered into a related "Equity Incentive Agreement," which "combined represent[ed] the complete agreement" between AVID and GMPC. *Id.* § 1.8.

39. Under the Equity Incentive Agreement, GMPC could earn certain equity incentive interests in AVID if it reached tiered "New Sales" figures:

| Calendar Year New Sales | Total Equity Incentives Vested |
|---|---|
| $1,000,000.00 to $1,999,999.99 | 10.0% of Membership Interests |
| $2,000,000.00 to $2,999,999.99 | 20.0% of Membership Interests |
| $3,000,000.00 to $3,999,999.99 | 30.0% of Membership Interests |
| $4,000,000.00 or greater | 40.0% of Membership Interests |

*See* Exhibit D, Equity Incentive Agreement § 3.

40. The Equity Incentive Agreement defined "New Sales" as including "annual Net Sales of Licensed Products to [] New Accounts." *Id.* § 1.3. "New

Accounts" were defined as "accounts and customers not listed on SCHEDULE A" that purchased Licensed Products "as permitted within the License Agreement." *Id.* § 1.2. Thus, "New Sales" do not include sales to unauthorized accounts.

41.    The Equity Incentive Agreement also provides that "[a]fter the expiration or termination of the Licens[ing] Agreement" GMPC must "use its best efforts to transition back to [AVID] all accounts, customers, sales reps, and product information, including but not limited to costing, designs, drawings, and/or technical information, related to the Licensed Products." Equity Incentive Agreement § 5.1. AVID is not required to issue equity or membership interests to GMPC until this transition occurs. *Id.* § 5.1.

42.    Like the Licensing Agreement, the Equity Incentive Agreement provides for "prevailing party" attorneys' and paralegals' fees. *Id.* § 13.8.

43.    Under the Licensing Agreement, either AVID or GMPC can terminate the agreement by providing "30 days written notice" of a material breach, provided that the breaching party fails to cure the breach during such 30-day period. Ex. C § 10.3. Once the Licensing Agreement terminates, so does the Equity Incentive Agreement. Ex. D § 7.

44.    GMPC's obligation to pay AVID any and all royalties "survive[s] the expiration or termination" of the Parties' agreements. Ex. C § 3.10.

**C. AVID transitions product manufacturing and distribution to GMPC.**

45.    In January 2019, with the Licensing Agreement and Equity Incentive Agreement in place, GMPC started its licensee work for AVID.

46.    As part of the initial transition, AVID turned over to GMPC the design and creative work it had already completed on the Spring/Summer 2019 and Fall/Winter 2019 product lines, including their current inventory of merchandise for GMPC to distribute and the existing customer orders and purchase orders, in accordance with the terms of the Licensing Agreement. Because the apparel business is highly seasonal, businesses like AVID must work months in advance to design and manufacture product lines so they will be available for distribution when the new season begins. For example, preparation for the Spring and Fall 2024 product lines have already started.

47.    Along with turning over the information related to the upcoming AVID product lines, AVID also turned over to GMPC without cost its network of sales representative, manufacturers, and distributors, with whom AVID had built relationships over the past decade. Despite GMPC's representations to AVID that it had its own network of manufacturers and distributors, GMPC continued to rely on AVID's network throughout the course of the parties' relationship.

48.    Additionally, before partnering with GMPC, AVID had been vetting options for a business-to-business platform to manage purchase orders with participating retailers. After extensive research into choosing the best platform for AVID but before AVID could set up an account, AVID entered in the contracts with GMPC. AVID passed along its research and had GMPC set up an account for AVID with NuOrder, an online business-to-business wholesale platform used

by apparel brands and retailers to take and place purchase orders. GMPC completed setup of AVID's NuOrder account in 2019.

49.    Before GMPC partnering with AVID, GMPC never had a NuOrder account for itself or any of the other retailers with whom it partnered.

50.    AVID also allowed GMPC to exclusively use AVID's domain name www.avidsportswear.com during the term of the Licensing Agreement. Ex. C, First Amendment § 1.8. Despite allowing GMPC to use the domain, AVID retained ownership, and GMPC was required to transfer the domain name back to AVID as "soon as practicable after the termination or expiration" of the Licensing Agreement. *Id.*

**D. GMPC's steady stream of uncured breaches.**

51.    Just a few months into the Parties' relationship, GMPC began what would become a long line of material, uncured breaches under the Licensing Agreement.

52.    For example, AVID noticed that GMPC started soliciting and selling to additional accounts without AVID's consent, in violation of section 1.5.5 of the Licensing Agreement.

53.    AVID informed GMPC of the breach, yet GMPC continued selling to unapproved new accounts.

54.    GMPC also failed to meet the contractually required Total Net Sales thresholds for Period 2 (January 1, 2020 through December 31, 2020), entitling AVID to "unilateral[] and immediate[] terminat[ion]." Licensing Agreement § 2.3.

55.    AVID put GMPC on notice of that uncurable breach as early as February 24, 2021. Ultimately, the Parties were able to resolve the dispute.

56.    Taking another example, GMPC failed to purchase sufficient supplemental in-season inventory (*i.e.*, not less than 25 percent of the season's pre-books) for nearly *every* season, including the Summer 2020, Fall/Holiday 2020, Spring 2021, and Summer 2021 seasons. GMPC's failures also extended to multiple individual product categories (*e.g.*, shirts), product lines (*e.g.*, AVIDry Performance Shirts), and product sizes (*e.g.*, Medium Core AVIDry 50+ UPF shirts in Glacier Grey), each of which flouts section 5.2.6 of the Licensing Agreement.

57.    In fact, GMPC not only regularly failed to purchase sufficient *supplemental* in-season inventory, but often failed to purchase enough *baseline* inventory to satisfy pre-booking orders, leading to unfulfilled preorders, unhappy customers, dissatisfied employees (who lost out on surefire sales because of GMPC's actions), and lost market share, revenue, royalties, goodwill, and reputation.

58.    GMPC never provided *any* detailed business plans as required under section 5.2.8 of the Licensing Agreement or the comprehensive pre-season packages of calendars, designs, dates, deadlines, and product samples envisioned under section 6.6. GMPC even failed to provide *any* business plan information—at all—for the Fall/Holiday 2020 season. AVID complained of these breaches repeatedly.

59.    And GMPC consistently failed to submit advertising and sales materials to AVID for preapproval, contrary to section 7.5 of the Licensing Agreement. Indeed, GMPC routinely used those unapproved materials to present unapproved concepts and products to AVID's longtime, preexisting customers including Dick's Sporting Goods and Ron Jon's.

60.    AVID demanded GMPC remedy these advertising and sales material breaches on multiple occasions, including January 26, 2021. Yet GMPC continued using unauthorized materials with AVID customers in breach of section 7.5.

61.    GMPC also regularly failed to seek and incorporate AVID's input and direction into graphics and products, violating section 6.2 of the Licensing Agreement. AVID again informed GMPC of those breaches.

62.    GMPC, in addition, has produced products falling below the contractually-required quality threshold.

63.    For example, GMPC provided subpar products to one of AVID's preexisting customers, Hibbett Sporting Goods. When Hibbett requested a refund or replacement inventory, GMPC balked; instead, AVID was required to use part of the marketing royalties to satisfy Hibbett. Subsequently, Hibbett stopped placing orders for AVID's products.

64.    GMPC also continually misuses and misappropriates AVID's federally registered AVID Mark and Hook Logo and other intellectual property. GMPC has sold licensed AVID'-branded products to unapproved accounts, used unapproved AVID logos, and otherwise infringed on AVID's trademark, all of

which dilutes and undermines AVID's brand. AVID has informed GMPC that it is misusing AVID's intellectual property on multiple occasions, but GMPC continues to do so.

65.    This pattern—GMPC breach, AVID complaint, GMPC refusal to change course—continued throughout most of the parties' relationship. However, AVID had made a substantial investment in its exclusive relationship with GMPC and AVID's preference was to encourage GMPC to meet its obligations and to make the relationship work.

66.    Each breach, independently, and taken together, demonstrates that, far from using "best efforts" to support the AVID brand, GMPC instead left AVID understaffed, under-resourced, and largely unattended to.

**E. AVID and GMPC amend the contracts.**

67.    One of AVID's concerns was that GMPC fired AVID's tenured brand manager in March 2020—without AVID's preapproval, in further breach of the Licensing Agreement—and refused to hire a replacement. As AVID's principals consistently told GMPC, not only did the lack of a full-time brand manager breach the letter and spirit of the Licensing Agreement, but it also hindered AVID's manufacturing, marketing, distribution, and sales efforts.

68.    So, to further protect AVID's reputation and goodwill, to give GMPC certain "COVID Concessions" (concessions AVID was not obligated to offer) in hopes that GMPC would turn things around, and to ensure GMPC finally put a brand manager permanently in place, AVID and GMPC executed a Second

Amendment to the Licensing Agreement and First Amendment to the Equity Incentive Agreement (the "Brand Manager Amendment") in April 2020.

69.     Through the Brand Manager Amendment, GMPC agreed to "re-hire a full-time Brand Manager" by, at latest, "December 31, 2020." Brand Manager Amendment § 2.H.

70.     This term was so material to the parties that if GMPC breached section 2.H, the Brand Manager Amendment was "immediately, unconditionally, and retroactively terminated." Brand Manager Amendment § 5. Upon that immediate, automatic termination, any "monies [] due pursuant to the Licens[ing] Agreement shall be immediately due and payable to [AVID]." *Id.*

71.     In addition to the core brand manager retention term, AVID also gave GMPC certain monetary concessions considering the COVID-19 pandemic.

72.     After waiting nearly six months, GMPC finally hired an AVID-dedicated brand manager in October 2020. Yet approximately ten days later, and after demanding that the brand manager perform three different roles (Product Manager, Development Manager, Operations Manager) with little or no support, GMPC forced him out.

73.     Throughout the balance of 2020, AVID urged GMPC to find a replacement, reminding GMPC that failure to do so by the end of the year would constitute an immediate and material breach of the contracts.

74.     GMPC did nothing. GMPC ended the year without an AVID brand manager in place, in open breach of the Brand Manager Amendment.

75.    In fact, GMPC failed to even *advertise* for a replacement brand manager until the last day of the cure period (and only after receiving a formal demand from AVID in January 2021), February 19, 2021.

76.    During 2020, GMPC repeated this pattern of leaving AVID with a barebones staff. For example, GMPC also furloughed and fired AVID's graphic designer (after asking him to do full-time work for part-time pay) and refused to retain a suitable replacement at its own expense, as contemplated by the Licensing Agreement.

77.    AVID, *again*, resolved the dispute with GMPC despite its multiple breaches by entering into a Third Amendment to the Licensing Agreement and Second Amendment to the Equity Incentive Agreement, effective July 31, 2021. This amendment required GMPC to immediately pay wrongfully withheld 2020 royalties of more than $150,000, and offered GMPC additional incentive to better provide for AVID's brand by offering it an additional year in which it could earn a membership interest in AVID under the Equity Incentive Agreement. Licensing Agreement, Third Amendment § 1.C and 1.E.

**F. After trying—and failing—to acquire AVID, GMPC quits.**

78.    In April 2022, GMPC approached AVID's principals, the Johnsons, about flying to California to discuss renewing its license and renegotiating the terms of the parties' contracts. Following the meeting, GMPC was to present AVID with the terms for the renewal proposal. But weeks passed without GMPC ever presenting terms to AVID.

79.     Then, on June 2, 2022, instead of providing terms for a license renewal, GMPC sent a term sheet for it to control and acquire AVID's intellectual property for $3 million.

80.     At the same time, GMPC attempted to strong arm AVID into accepting the buyout by threatening to cease work on the upcoming 2023 product lines, in breach the Licensing Agreement, if the Johnsons did not accept.

81.     On June 9, 2022, AVID rejected GMPC's offer and reminded GMPC of its obligations under the Licensing Agreement that GMPC "shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products and will bear all related fees, costs, and expenses associated therewith." Ex. C § 5.2.4.

82.     On June 23, 2023, in response to the failed buyout, GMPC provided written notice of its intent not to renew the Licensing Agreement for an additional term. GMPC also reiterated it would not fulfill its obligations to produce and manufacture AVID's 2023 product lines (which, given product cycles, would occur in 2022 while the license remained in full force and effect). The consequences of GMPC's standstill for the remainder of its license term could be dire and irreparable.

83.     AVID responded on July 5, 2022, acknowledging receipt of the non-renewal notice and again reminding GMPC of its continued obligations for the remainder of the Licensing Agreement's term.

**G. GMPC—again—breaches the Licensing Agreement.**

84.    On July 20, 2022, GMPC told AVID it had ceased all work on the Fall 2023 product line.

85.    Consequently, AVID—at its own expense—engaged product design and development professionals on August 1, 2022, to mitigate the damage caused to AVID's brand by GMPC's refusal to comply with the terms of the Licensing Agreement.

86.    On August 8, 2022, GMPC again advised AVID it would continue breaching the Licensing Agreement moving forward because GMPC contended it was not required to order and finance production of products that AVID or GMPC's successor would sell after the Licensing Agreement terminated. In essence, GMPC argued, nonsensically, that it should be excused from its contractual obligations simply because work on seasonal 2023 lines would need to occur in 2022.

87.    Yet, as AVID explained, again, the plain language of the Licensing Agreement provides that GMPC had the exclusive right and obligation to manufacture and sell AVID's Licensed Products, and was "solely responsible for sales, product development, design and production, logistics and financing" for AVID's Licensed Products during the term of the Licensing Agreement. Ex. C § 1.3, § 1.5, and § 7.1. Likewise, GMPC agreed to "bear all []fees, costs, and expenses associated" with the "manufacture, production, sale and distribution" of AVID's Licensed Products during that period. *Id.* § 5.2.4.

88.    GMPC's contention is also contrary to the party's prior dealings when they executed the Licensing Agreement. At that time, AVID turned over to GMPC the work it had already completed regarding the Spring and Fall 2019 product lines even though AVID had already incurred significant costs. This reflects the nature of the apparel business, where design, product order placement, and manufacturing must begin months before products are distributed.

89.    On August 17, 2022, GMPC told AVID that "all factories are on hold" regarding the Fall 2023 product line. The next day, GMPC told AVID's sales manager that the Spring 2023 buy plan had "completely changed," and GMPC withheld Spring 2023 purchasing data needed for sales and marketing efforts.

90.    GMPC stopped design and development of the Fall 2023 product line and fired its internal design team staff. GMPC then sent incomplete designs and work product to AVID, forcing AVID to scramble and hire contract designers.

91.    Because GMPC refused to comply with the Licensing Agreement, on August 23, 2022, AVID provided written notice that GMPC was in breach of the Licensing Agreement and advised that the Licensing Agreement would be terminated in 30 days if GMPC failed to cure. Exhibit E, T. Carnrite Letter. AVID also demanded GMPC immediately transition the business back to AVID since it was refusing to comply with obligations under the Licensing Agreement and yet still had exclusive control of accounts and information needed for AVID to run the business.

92.    GMPC did not cure the breach, so the Licensing Agreement terminated September 22, 2022. Ex. C § 10.3. The Equity Incentive Agreement likewise terminated September 22, 2022. Ex. D § 7.

93.    Upon termination of the Licensing Agreement, all of GMPC's licenses terminated and GMPC was required to "immediately discontinue all use of the Licensed Property." Ex. C § 11.3. GMPC was also required to "immediately" return to AVID "all material relating to the Licensed Property." *Id.* § 11.4.

**H. GMPC fails to transition control of business back to AVID.**

94.    Acknowledging that the Licensing Agreement and Equity Incentive Agreement were terminating, GMPC created a sharefile in August 2022 to begin transitioning information back to AVID. But GMPC failed to fully transition AVID's business back to it, as required by the parties' agreements and prior dealings.

95.    Despite maintaining that it was not required to order, manufacture, or produce AVID's Spring and Fall 2023 lines, GMPC refused to transition control of AVID's preexisting manufacturing network back to AVID. The refusal to timely transition resulted in manufacturing delays that forced AVID to incur additional shipping costs to mitigate the delays and lost sales. GMPC's failure also resulted in the loss of AVID's goodwill, which the Johnsons had built up well before entrusting GMPC with critical aspects of their business.

96.    During the term of the Licensing Agreement, GMPC engaged new headwear manufacturers for AVID's Licensed Products. But GMPC held AVID hostage, refusing to transition these headwear manufacturing accounts to AVID even though GMPC knew headwear was AVID's top product category. Even after AVID (unnecessarily) offered to pay GMPC a standard, market rate buying agent fee for their time and services, GMPC declined any such fee and continued to demand that AVID purchase the headwear products directly from GMPC at a cost markup 2-3 times above the actual product costs.

97.    Additionally, while holding AVID hostage over headwear purchases (AVID's top product category), GMPC knowingly withheld from AVID the actual product costs related to headwear yet shared select other product costs. This was an attempt to induce AVID to blindly enter into a lop-sided agreement by withholding product cost information GMPC was contractually required to turn over to AVID when the Licensing Agreement terminated.

98.    Ultimately, AVID was forced to find a new headwear manufacturer, despite GMPC's obligation to transition AVID-related accounts and product information back to AVID.

99.    GMPC's refusal to transition this business account delayed the manufacturing and distribution of AVID's headwear products, resulting in lost sales and additional costs associated with the late addition of a new headwear supplier. Headwear has always been a leading core product category for AVID.

100.   As an additional example of GMPC's improper actions, GMPC delayed providing AVID headwear products to a key retailer for a month, resulting in lost sales of $50,000–$60,000 for just that account alone.

101.   In addition to failing to turn over product and manufacturer information, GMPC also failed to transition use of AVID's website domain name back to it immediately upon termination of the Licensing Agreement, as required. Ex. C, First Amendment § 1.8. That transfer did not occur until months later, on March 29, 2023. During the interim, GMPC continued to improperly use AVID's domain to market, advertise, and sell AVID's products even though GMPC had no right to do so.

102.   In addition to the pre-existing AVID domain, GMPC also created two other AVID domains—avid-brand.com and avidgear.co—("Infringing Domain Names")—without authorization during the term of the Licensing Agreement. GMPC failed to turn over these domains to AVID.

103.   Finally, GMPC refused to turn over control of AVID's NuOrder account. Because GMPC would not turn over control of the NuOrder account, AVID was forced to acquire a new account so it could continue to receive purchase orders.

104.   GMPC continues to improperly use AVID's NuOrder account, including a NuOrder Online Marketplace listing to sell Licensed Products direct to retailers. AVID never approved GMPC selling Licensed Products via a NuOrder

Online Marketplace, meaning those sales are outside the distribution channels approved by AVID in further breach of the Licensing Agreement.

**I. GMPC's misconduct during sell-down period.**

105.   When the Licensing Agreement terminated on September 22, 2022, GMPC had a surplus of AVID Licensed Product dating back years—and still had approximately $1.8 million worth of inventory as of July 2023.

106.   Under the Licensing Agreement, GMPC had 12 months (1) "to complete the manufacture and sale of all purchase orders" in its possession, and (2) to sell inventory in its possession. Ex. C § 11.2. Thus, GMPC could sell its inventory through September 22, 2023.

107.   GMPC did not, though, have the right to continue to use AVID's marks, sales platforms, copyrighted product photographs and other AVID intellectual property.  GMPC's sole and limited right during the sell-through period is to "**continue to sell Inventory that is in LICENSEE'S possession or in the process of being produced at the time of expiration or termination of the Agreement.**" *Id.* § 11.2.

108.  In violation of the parties' agreements, GMPC continued to manufacture AVID products, both previously Licensed Products and unauthorized, non-approved products, after the Licensing Agreement terminated. For example, GMPC ordered these improper AVID products for manufacturing in January 2023 despite no bona fide purchase orders being approved by AVID that

GMPC would have been permitted to manufacture under the Licensing Agreement. These "dummy" purchase orders were not bona fide, approved customer purchase orders. Instead, GMPC invented these purchase orders to illegally manufacture and appropriate AVID goods after the Licensing Agreement expired.

109.   Despite the Licensing Agreement having terminated, GMPC continues to use AVID's registered marks and intellectual property to market and advertise its inventory on NuOrder and elsewhere.  Incredibly, GMPC holds itself out as AVID: "GMPC, LLC dba AVID Sportswear." Exhibit F, K. Kepchar Letter.

110.   In fact, GMPC is using AVID's registered marks and intellectual property, without authorization or right, to advertise GMPC's inventory at deep discounts and extended payment terms to the very same buyers AVID is engaging. For instance, GMPC has sent the following advertisement:



111.   GMPC's unauthorized marketing and advertising using AVID's registered marks and intellectual property has resulted in AVID and GMPC advertising the same products to the same buyers, but with GMPC offering discounted rates and extended payment terms. For example, GMPC sold various products from AVID's current Fall 2023 product line to a retailer in Key West on July 7, 2023, at a 40% discount.

112.   To avoid confusion about and prevent harm to AVID's brand, AVID has demanded that GMPC cease and desist from the unauthorized use of AVID's registered marks and intellectual property, and that GMPC cease marketing and advertising AVID's products. Ex. F. To date, GMPC has not met AVID's demands.

113.   In an effort to avoid dispute and continued harm to AVID's brand, AVID has also offered to sell GMPC's surplus inventory on consignment in a coordinated effort with its sales reps and distribution channels, even though it has no obligation to do so. In response, GMPC is demanding AVID buy the surplus inventory not just above cost, but at a higher price than what GMPC is marketing the surplus inventory to third-party retailers and buyers.

114.   AVID also learned that before GMPC started transitioning operations back to AVID, GMPC downloaded AVID's Shopify customer data without AVID's knowledge or consent on March 16, 2023. Upon information and belief, GMPC is using this wrongfully acquired and retained information to try to sell its

inventory and the inventory GMPC, on information and belief, continues to produce in violation of the terms of the sell-down.

**J. GMPC failed to operate AVID's website in accordance with the law.**

115.  In addition to allowing GMPC to use the domain name www.avidsportswear.com, AVID granted the exclusive license of its e-commerce website, www.avidgear.com, to GMPC in early 2019 as part of the Licensing Agreement. Despite GMPC being required to transition control of the website back to AVID upon the September 2022 termination of the Licensing Agreement, GMPC did not do so until March 2023.

116.  AVID was sued in Southern District of New York in the case *Henry Tucker v. AVID Sportswear, LLC*, No. 1:23-cv-3937 (S.D.N.Y. May 10, 2023) (the "ADA Case"), alleging AVID's website was not compliant with the Americans with Disabilities Act ("ADA") when the plaintiff accessed it in August 2022 and February 2023. That was when GMPC had exclusive technical and operational control of AVID's website.

117.  The Licensing Agreement requires GMPC to be responsible for all costs associated with the website and to defend and indemnify AVID "against and from any and all losses, claims, suits, expenses, costs, damages or liabilities" relating or arising out of GMPC's services. Ex. C, § 1.5.4 and § 14.2.

118.  GMPC initially received direct notice regarding this suit, yet GMPC did not defend AVID in the ADA Case, and AVID was forced to retain counsel to defend itself.

119.    AVID also incurred costs related to the settlement of the ADA Case for which GMPC was obligated but failed to indemnify AVID.

## COUNT ONE
## Declaratory Judgment
### (Date of Termination)

120.    AVID incorporates paragraphs 1–119 as if fully set forth herein.

121.    AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

122.    GMPC materially breached those contracts as described above, and AVID provided written notice that the contracts would terminate if GMPC did not cure its material breaches.

123.    AVID contends the contracts terminated effective September 22, 2022, thirty days after written notice of the breach was provided since GMPC did not cure. GMPC contends AVID failed to terminate the contracts, and that the contracts expired at the end of the Initial Term on December 31, 2022.

124.    AVID requests a declaration that the contracts terminated on September 22, 2022, and that the 12-month sell-down period for GMPC to sell its surplus inventory therefore expires on September 22, 2023.

125.    There is a bona fide, actual, present practical need for the declaration requested by AVID. The dispute regarding the termination date of the contract affects not only the expiration of the sell-down period but also the calculation of the equity to which GMPC is entitled pursuant to the Equity Incentive Agreement.

126.    The declaration requested by AVID deals with a present, ascertainable set of facts and a present controversy as to a state of facts: namely, whether AVID's August 23, 2022 written notice of breach effectively terminated the contracts when GMPC failed to cure its breach.

127.    The rights of AVID to enforce the scope of the contract, including the termination of the sell-down period and its right to issue equity to GMPC is dependent upon the law applicable to the facts.

128.    GMPC has an actual, present, adverse, and antagonistic interest in the subject matter of the declaration sought by AVID.

129.    This declaration is not sought merely for the giving of legal advice.

**COUNT TWO**
**Declaratory Judgment**
**(Equity earned by GMPC)**

130.    AVID incorporates paragraphs 1–119 as if fully set forth herein.

131.    AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

132.    Under the Equity Incentive Agreement, GMPC could earn equity in AVID if its Net Sales reached certain annual thresholds. Equity Incentive Agreement § 3. Net Sales under the Equity Incentive Agreement are defined as the Net Sales of Licensed Products to, among others, New Accounts. Equity Incentive Agreement § 1.3. New Account, in turn, is defined as accounts and customers not included on the pre-existing schedule of customers to which Licensed Products are

sold "as permitted within the License Agreement." Equity Incentive Agreement §
1.2.

133.    As such, the Net Sales definition in the Equity Incentive Agreement
does not include GMPC's sales to unapproved accounts both within and outside
of the authorized Distribution Channels to which the parties agreed in the
Licensing Agreement.

134.    The Equity Incentive Agreement also provides that, in the event of its
early termination, New Sales will be "calculated as of January 1st of such year to
the date of such early termination." Equity Incentive Agreement § 7.

135.    As alleged above, AVID terminated the Licensing Agreement
effective September 22, 2022, thus New Sales under the Equity Incentive
Agreement for 2022 do not include sales to unauthorized accounts between
January 2022 and September 22, 2022.

136.    AVID contends New Sales from January 1, 2022, to September 22,
2022, entitle GMPC to a 20% membership interest in AVID. GMPC argues it is
entitled to a 30% membership interest in AVID.

137.    AVID requests a declaration that the Equity Incentive Agreement
entitled GMPC to a 20% membership interest in AVID, not 30%.

138.    There is a bona fide, actual, present practical need for the declaration
requested by AVID. The dispute regarding both the definition of New Sales and
the termination date of the Equity Incentive Agreement affects the calculation of
the equity to which GMPC is entitled.

139.   The declaration requested by AVID deals with a present, ascertainable set of facts and a present controversy as to a state of facts: namely, the amount of GMPC's New Sales and whether AVID's August 23, 2022 written notice of breach effectively terminated the Equity Incentive Agreement on September 22, 2022.

140.   The rights of AVID to calculate GMPC's membership interest in AVID is dependent on the facts applicable to the law.

141.   GMPC has an actual, present, adverse, and antagonistic interest in the subject matter of the declaration sought by AVID.

### COUNT THREE
### Breach of Contract
### (Failure to prepare 2023 products)

142.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

143.   AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

144.   GMPC breached those contracts by, among other things, refusing to prepare AVID's Spring and Fall 2023 product lines.

145.   AVID performed all material terms required under the contracts in question.

146.   GMPC's breach directly and proximately damaged AVID.

### COUNT FOUR
### Breach of Contract
### (Sale to unauthorized accounts)

147.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

148.   AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

149.   GMPC breached those contracts by, among other things, selling AVID's products to unauthorized accounts outside the parties' agreed Distribution Channels, selling AVID's products within unauthorized channels, and selling unauthorized AVID products that GMPC manufactured after the Licensing Agreement terminated. Effectively, GMPC commandeered AVID's control of its brand, and AVID only learned of the unauthorized sales after such sales were completed.

150.   AVID performed all material terms required under the contracts in question.

151.   GMPC's breach directly and proximately damaged AVID, which is entitled to the full amount of any sales to such unauthorized accounts or through unauthorized channels.

### COUNT FIVE
### Unjust Enrichment
### (Sale to unauthorized accounts)

152.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

153.   AVID conferred benefits onto GMPC, including a limited license to use AVID's trademarks, designs, intellectual property, relationships, and goodwill to facilitate sales of sportswear to authorized accounts within established Distribution Channels.

154.   GMPC had knowledge of and openly accepted and availed itself of the foregoing benefits including by, among other things, selling AVID Licensed Products to unauthorized accounts, selling AVID Licensed Products outside of the authorized Distribution Channels, and selling unauthorized AVID Licensed Products, and retaining funds derived from such unauthorized sales.

155.   Under the circumstances, it would be inequitable for GMPC to retain the benefits from sales of AVID products.

## COUNT SIX
### Conversion
### (Sale to unauthorized accounts)

156.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

157.   Under the contracts referenced in the Complaint, GMPC only had a license to sell AVID's Licensed Products to approved accounts within established distribution channels. Ex. C § 1.3 and § 1.5.

158.   GMPC, though, routinely sold AVID's Licensed Products to unapproved accounts inside and outside approved channels. For instance, GMPC set up a business-to-business NuOrder Online Marketplace account where it sold AVID's Licensed Products.

159.   GMPC has kept proceeds from the unauthorized sale of AVID's Licensed Products to which it is not entitled, which is inconsistent with AVID's ownership right in the full proceeds for the sale of Licensed Products outside the limited license issued to GMPC.

**COUNT SEVEN**
**Breach of Contract**
**(Failure to transition operations to AVID)**

160.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

161.   AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

162.   GMPC breached those contracts by, among other things, failing to or delaying in transferring all "accounts, customers, sales reps, and product information" to AVID upon termination or expiration of the contracts. This includes, but is not limited to, the failure to turn over control of manufacturer accounts, product information, website domains, and AVID's NuOrder account.

163.   AVID performed all material terms required under the contracts in question.

164.   GMPC's breach directly and proximately damaged AVID, including but not limited to lost profits, increased shipping costs, expenses associated with engaging new manufacturers and accounts, among others.

**COUNT EIGHT**
**Breach of Contract**
**(Continued use of AVID's marks and name after license term)**

165.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

166.   AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

167.   GMPC breached those contracts by, among other things, continuing to use AVID's registered marks and logos, the AVID name and other intellectual

property in (unapproved) marketing and advertisements after the contract terminated, in each case in a manner that exceeds GMPC's limited post-termination right to sell-through certain branded AVID products then on hand or in progress as of the effective date of termination.

168.    AVID performed all material terms required under the contracts in question.

169.    GMPC's breach directly and proximately damaged AVID.

### COUNT NINE
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Pre-termination conduct)

170.    AVID incorporates paragraphs 1–119 as if fully set forth herein.

171.    Under the contracts referenced in the Complaint, GMPC had a duty to manufacture, produce, sell, and distribute AVID's Licensed Products, bearing all associated costs, through the term of the Licensing Agreement. Licensing Agreement § 5.2.4. GMPC also had a duty to maintain the quality of AVID's Licensed Products and was required to provide a business plan prior to the state of the Spring and Fall seasons. Ex. C § 5.2.3 and § 5.2.8.

172.    GMPC consciously and deliberately failed to discharge the above contractual responsibilities in several ways following its failed bid to acquire AVID.

173.    GMPC refused to order and manufacture AVID's Spring 2023 product line, resulting in delays and increased expenses incurred by AVID for expedited manufacturing and shipping.

174.    GMPC also refused to design, develop, and sample AVID's Fall 2023 product lines, a process that had to be started in 2022 to ensure sales and manufacturing for the product line could be timely completed. This includes GMPC firing the design team responsible for designing and developing AVID's Fall 2023 products, which forced AVID to retain contract designers.

175.    GMPC produced inferior quality AVID products, which it then sold to AVID's pre-existing customers and refused to properly address or respond to AVID's customers' complaints.

176.    These actions unfairly frustrated the Parties' agreed upon common purpose of using best efforts to promote, sell, and distribute AVID products and preserve AVID's preexisting goodwill and reputation. Ex. C § 5.2.1.

177.    GMPC's actions undermine AVID's reasonable commercial expectations and do not represent good faith or fair dealing.

178.    GMPC's actions deprive AVID of the benefits of the Parties' contracts by undermining the AVID brand, depressing sales, and hurting AVID's preestablished goodwill and market reputation.

179.    GMPC's breach directly and proximately damaged AVID.

**COUNT TEN**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Post-termination conduct)**

180.    AVID incorporates paragraphs 1–119 as if fully set forth herein.

181.    Under the contracts referenced in the Complaint, GMPC had a duty upon termination of the contracts to return to AVID its materials, accounts,

customers, sales reps, product information, and domain, among other items. Ex. C § 1.8, § 11.3, and § 11.4; Ex. D § 5.1.

182. GMPC consciously and deliberately failed to discharge the above contractual responsibilities in several ways.

183. GMPC refused to return to AVID's control of its e-commerce platform for six months during which GMPC continued to use, operate, and profit from the AVID website. GMPC continues to control two other domains it created without AVID's authorization.

184. GMPC failed to turn over AVID's NuOrder account, forcing AVID to establish a new account at its costs while GMPC continued to use the NuOrder account and associated business-to-business online marketplace.

185. GMPC failed to turn over access to the manufacturers it used to produce AVID's Licensed Products, including multiple headwear manufacturers, unless AVID paid above-market costs directly to GMPC. Unlike GMPC, AVID freely turned over its preexisting network of manufacturers to GMPC when the parties entered into their contracts.

186. GMPC improperly downloaded and retained AVID's e-commerce customer data that it had no right to retain.

187. GMPC, in an attempt to sell down its surplus inventory, continued using AVID's registered marks and intellectual property and offered deeply discounted AVID products to AVID's preexisting customers. When AVID offered to sell GMPC's surplus inventory on a coordinated basis with reduced royalties to

avoid AVID's brand dilution and other harm, GMPC refused. Instead, GMPC offered to sell AVID the surplus inventory for more than GMPC was marketing the same inventory to AVID's customers.

188.    These actions unfairly frustrated the Parties' agreed upon common purpose of using best efforts to promote, sell, and distribute AVID products and preserve AVID's preexisting goodwill and reputation. Ex. C § 5.2.1.

189.    GMPC's actions undermine AVID's reasonable commercial expectations and do not represent good faith or fair dealing.

190.    GMPC's actions deprive AVID of the benefits of the Parties' contracts by undermining the AVID brand, depressing sales, and hurting AVID's pre-established goodwill and market reputation.

191.    GMPC's breach directly and proximately damaged AVID.

**COUNT ELEVEN**
**Florida Deceptive and Unfair Trade Practice Act**
**(Post-termination conduct)**

192.    AVID incorporates paragraphs 1–119 as if fully set forth herein.

193.    AVID granted GMPC an exclusive license a defined, time-limited and exclusive license to "use, manufacture, market, and distribute" AVID's branded products. But AVID maintained ownership of the AVID Mark and Hook Logo, and maintained significant oversight of the design of AVID branded products.

194.    The license was limited in that it limited the accounts to which GMPC could sell AVID's Licensed Products, the Distribution Channels in which Licensed

41

Products could be sold, and limited the time during which GMPC could manufacture, market, distribute, and sell AVID's Licensed Products.

195. GMPC unfairly and deceptively acted outside the bounds of the defined, time-limited license in multiple ways, including but not limited to the following:

a. Selling AVID's Licensed Products to unapproved accounts, including diverting sales from preexisting customers to unapproved new accounts in an effort to drive up new sales to acquire equity incentive interests in AVID under the Equity Incentive Agreement;

b. Selling AVID's Licensed Products outside of approved Distribution Channels;

c. Continuing to use AVID's e-commerce domain for approximately 6 months after the Licensing Agreement terminated;

d. Manufacturing new, unapproved orders of AVID-branded products after the Licensing Agreement terminated to sell in competition with AVID;

e. Marketing and advertising AVID Licensed Products at deep discounts and with extended payment terms using the AVID Mark and Hook Logo, and while holding itself out as AVID, after the Licensing Agreement termination in direct competition with AVID;

f. Failing to transition control of AVID's accounts, customers, sales reps, and product information, including costing, designs, drawings

and/or technical information after the Licensing Agreement terminated while it continued to use the information to sell AVID Licensed Products;

g. Ceasing production and design of AVID's 2023 product lines, terminating its design team staff, and refusing to turn over accounts, including those of manufacturers, to increase opportunities for GMPC to sell AVID Licensed Products during the sell-through period while AVID's new product lines were delayed;

h. Manufacturing and selling inferior quality products to AVID's pre-existing national retailers and failing to address customer concerns; and

i. Downloading and maintaining AVID's e-commerce website customer data after the termination of Licensing Agreement to try to sell its inventory of AVID Licensed Product.

196. GMPC has also represented its intention to engage in further unfair and deceptive acts by insisting the sell-through period expires in December 2023, evidencing an intent to continue to unfairly compete with AVID for months after GMPC's right to sell its inventory of AVID Licensed Product expires.

197. These unfair and deceptive acts have proximately damaged AVID by causing lost sales/profits and increased expenses to AVID, diluting AVID's brand, diminishing AVID's brand and intellectual property, and loss of goodwill. These damages are continuing in nature.

## COUNT TWELVE
### Breach of Contract
### (Failure to defend and indemnify)

198.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

199.   AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts.

200.   GMPC breached those contracts by, among other things, failing to defend and indemnify AVID in the ADA Case.

201.   AVID performed all material terms required under the contracts in question.

202.   GMPC's breach directly and proximately damaged AVID.

## COUNT THIRTEEN
### Common Law Indemnity
### (Failure to defend and indemnify)

203.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

204.   AVID and GMPC executed the contracts and amendments referenced in the Complaint, all of which are valid contracts. Pursuant to the Licensing Agreement, AVID licensed the exclusive control of its website, www.avidgear.com, to GMPC in 2019.

205.   GMPC maintained exclusive control of AVID's website from 2019 through March 2023.

206.   AVID was sued in the ADA Case because the AVID website operated exclusively by GMPC was not ADA compliant.

207.   AVID, which did not have control of its website, was without fault in its website becoming ADA non-compliant. Instead, it was vicariously, constructively, derivatively, or technically liable due to the fault of GMPC.

## COUNT FOURTEEN
## Federal Trademark Infringement

208.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

209.   GMPC is a former licensee under the AVID Mark and AVID Logo. GMPC has continued to use the AVID Mark and AVID Logo, without AVID's authorization, after termination of its license in a manner that exceeds the scope of its limited right to sell-through certain AVID-branded merchandise.

210.   GMPC is using AVID's registered AVID Mark and Hook Logo in connection with the marketing and sale of apparel in a manner likely to cause confusion, or to cause mistake, or to deceive as to source or sponsorship of the products or as to affiliation between the parties, and thus constitutes infringement of AVID's registered trademarks in violation of the Lanham Act, 15 U.S.C. § 1114.

211.   GMPC is engaging in the sale and promotion of apparel using the AVID Mark and Hook Logo through the same channels of trade as utilized by AVID to overlapping classes of purchasers.

212.   GMPC is using the AVID Mark and Hook Logo to advertise, promote and sell products at a drastically discounted price point well below AVID's premium price point.

213.    Purchasers and potential purchasers are likely to believe, in error, that GMPC's goods originate with AVID, and/or that GMPC's goods are sponsored or licensed by AVID, and/or that the parties are affiliated.

214.    Purchasers are likely to purchase GMPC's goods believing they are AVID's goods or are endorsed by, or marketed under an agreement with AVID, thereby resulting in damage and injury to AVID and its business, reputation and goodwill.

215.    GMPC's acts of trademark infringement are willful, and such acts have caused and will cause further irreparable injury to AVID if GMPC is not restrained by this Court from further violation of AVID's rights.

216.    AVID has no adequate remedy at law.

## COUNT FIFTEEN
## Federal Unfair Competition and False Designation of Origin

217.    AVID incorporates paragraphs 1–119 as if fully set forth herein.

218.    GMPC's unauthorized use of the AVID Mark and Hook Logo is in federally-regulated commerce.

219.    GMPC has held itself out as AVID by using the AVID tradename without authorization in promoting and operating its business. GMPC's use of the AVID Mark, Hook Logo and AVID tradename as described herein constitutes a false designation of origin or false representation that wrongfully and falsely designates GMPC and its goods as originating from or connected with AVID.

220.    As a direct and proximate result of GMPC;s unfair competition, AVID has incurred damage to its business, reputation and goodwill.

221.   GMPC's actions constitute federal unfair competition and violate the Lanham Act, 15 U.S.C. § 1125(a).

222.   GMPC's acts of unfair competition will cause further irreparable injury to AVID if GMPC is not restrained by this Court from further violation of AVID's rights.

223.   AVID has no adequate remedy at law.

## COUNT SIXTEEN
### Cybersquatting Under 15 U.S.C. § 1125(d)

224.   AVID incorporates paragraphs 1–119 as if fully set forth herein.

225.   GMPC has registered and  continues to use the Infringing Domain Names with a bad faith intent to retain control over certain aspects of AVID's business after the License Agreement and Equity Incentive Agreement have been terminated. GMPC's registration and use of the Infringing Domain Names are without AVID's authorization.

226.   The absence of any *bona fide* legitimate business reason for GMPC to hold and control the Infringing Domain Names further underscores GMPC's bad faith.

227.   Through substantial advertisement and promotion of the AVID Mark and name by AVID since at least 2010, such mark and name was distinctive of AVID's products and business prior to the registration dates of the Infringing Domain Names.

228. The Infringing Domain Names incorporate the AVID Mark and name in its entirety. Each such Domain Name is confusingly similar to the AVID Mark and name.

229. GMPC's registration and use of the Infringing Domain Names constitute cybersquatting under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

230. AVID has been and will continue to be seriously and irreparably damaged unless GMPC is enjoined from using the Infringing Domain Names. GMPC lacks an adequate remedy at law and has suffered and will suffer immediate and irreparable harm unless the Court orders the forfeiture or transfer of the Infringing Domain Names and GMPC is enjoined from using or registering the Infringing Domain Names or any other domain names confusingly similar to the AVID mark and name.

231. As a result of GMPC's actions, AVID has been damaged in amounts that have not yet been determined.

## COUNT SEVENTEEN
### Trademark Infringement and Unfair Competition Under Florida Law

232. AVID incorporates paragraphs 1–119 as if fully set forth herein.

233. AVID's AVID Mark and Hook Logo have been used in the State of Florida for AVID's products long prior to the infringing acts of GMPC complained of herein, and are valid and legally enforceable.

234. Over AVID's objections, GMPC has reproduced, copied and is using the AVID Mark and the Hook Logo to promote and sell apparel in a manner likely

to cause confusion about the source or sponsorship of the goods or as to an affiliation between the parties, in violation of Florida law.

235.   AVID has no adequate remedy at law.

## RESERVATION OF RIGHTS

AVID reserves the right to assert additional claims, including those for punitive damages under Fla. Stat. § 768.79, and any additional causes of action that might be revealed during AVID's investigation of, and discovery into, this matter. AVID also reserves the right to name additional defendants, including but not limited to GMPC, Inc., Gary Mandel, Flash Mandel, Mark Lipschitz and/or Steve Wegner.

## PRAYER FOR RELIEF

WHEREFORE, AVID respectfully requests an order awarding the following relief:

A.   Compensatory, consequential, and special damages in favor of AVID, including pre- and post-judgment interest, for all damages sustained as a result of GMPC's wrongdoing, in an amount to be proven at trial;

B.   AVID's reasonable costs and expenses incurred in investigating and litigating these claims, including attorneys' fees, paralegals' fees, witnesses' fees, investigation fees, court reporters' fees, and any other out-of-pocket expenses;

C.   Specific performance and/or equitable relief in favor of AVID, including that GMPC immediately use its best efforts to transition back to AVID all accounts, customers, sales representatives, product information, and other

related materials and information back to AVID and, separately, abide by the Parties' contractual agreements concerning all materials, intellectual property, products, and other materials in which AVID has a contractual, equitable, or other interest or right in.

D.    A declaration consistent with the above.

E.    That GMPC be permanently enjoined from using the AVID Mark, Hook Logo and AVID tradename in a manner likely to cause confusion, mistake or deception including, without limitation, as a mark, name, domain name, metatag or email address.

F.    That AVID be awarded all gains, profits and advantages derived by GMPC from said trademark infringement and unfair competition.

G.    That AVID be awarded three times such profits or damages, whichever is greater, together with pre-judgment interest, in consequence of GMPC's willful trademark infringement and unfair competition;

H.    That AVID be awarded for statutory damages of up to $100,000 per infringing domain name for GMPC's acts of cybersquatting, or AVID's actual damages, at its option.

I.    An order that GMPC identify all domain names in its or its affiliates' possession, custody or control that include or comprise "AVID".

J.    An order that GMPC transfer ownership in the Infringing Domain Names to AVID.

K.    AVID's reasonable attorneys' fees and the full costs of the action under the Equity Incentive Agreement, 15 U.S.C § 1117, Fla. Stat. § 495.141, and Fla. Stat. § 501.2105.

L.    such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

*/s/ Kyle W. Robisch*
Kyle W. Robisch, Esq.
Florida Bar No. 113089
Jacob B. Hanson, Esq.
Florida Bar. No. 91453
**Bradley Arant Boult Cummings LLP**
100 N. Tampa St., Suite 2200
Tampa, FL 33602
T: (813) 559-5500 | F: (813) 229-5946
Primary email: krobisch@bradley.com
Primary email: jhanson@bradley.com
Secondary email: tabennett@bradley.com

Karol A. Kepchar (pro hac vice to be filed)
D.C. Bar No. 491701
**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street NW
Washington, D.C. 20006
Telephone: 202.887.4000
Facsimile: 202.887.4288
Primary email: kkepchar@akingump.com

*Counsel for Plaintiff AVID Sportswear, LLC*